**SOUTH–SUBURBAN HOUSING CENTER, Plaintiff–Appellee, Cross–Appellant,**

**v.**

**GREATER SOUTH SUBURBAN BOARD OF REALTORS and National Association of Realtors, Defendants, Counterplaintiffs–Appellants, Cross–Appellees,**

**v.**

**CITY OF BLUE ISLAND, et al., Counterdefendants–Appellees, Cross–Appellants.**

Nos. 89–2115, 89–2122, 89–2123, 89–2218, 89–2767, 89–2777, 89–2778 and 89–2846.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1990.

Decided June 19, 1991.

Rehearing and Rehearing In Banc Denied Sept. 5, 1991.

Robert C. Johnson, C. Mark Kingseed, Richard Chessen, Sonnenschein, Nath & Rosenthal, Alexander Polikoff, Robert L. Jones, Jr., John R. Hammell, Roger Baldwin Foundation, Chicago, Ill., for plaintiff-appellee, cross-appellant South–Suburban Housing Center.

Philip C. Stahl, Darrell J. Graham, David E. Schoenfeld, Grippo & Elden, Chicago, Ill., for defendants, counterplaintiffs-appellants, cross-appellees Greater South Suburban Bd. of Realtors and National Ass'n of Realtors.

Barbara E. Hermansen, Richard J. Hoskins, Joseph A. Cancila, Jr., Thomas B. Quinn, Schiff, Hardin & Waite, Chicago, Ill., James R. Schirott, John T. Elsner, Schirott & Associates, Itasca, Ill., for defendants-appellees City of Blue Island, Village of Calumet Park, City of Country Club Hills, Village of Glenwood, Village of Hazel Crest, Village of Matteson, Village of Park Forest, Village of Richton Park and Village of University Park.

Cary A. Horvath, Chicago, Ill., for defendant-appellee Village of Calumet Park.

Ronald L. Kammer, Hinshaw & Culbertson, Chicago, Ill., for defendant-appellee City of Country Club Hills.

Thomas S. Moore, Frank K. Neidhart, Jr., McCarthy, Duffy, Neidhart & Snakard, Chicago, Ill., for defendant-appellee Village of University Park.

Jonathon H. Margolies, Schiff, Hardin & Waite, Chicago, Ill., for defendant-appellee City of Blue Island.

Before WOOD, Jr., COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

These consolidated appeals deal with a variety of constitutional and Fair Housing Act challenges to real estate marketing activities and municipal ordinances affecting the real estate market in a number of the southern suburbs of Chicago, Illinois. The municipalities involved are the Cities of Blue Island and Country Club Hills and the Villages of Calumet Park, Glenwood, Hazel Crest, Matteson, Park Forest, Richton Park and University Park. The court disposed of these issues following a bench trial consisting of approximately eight weeks of testimony presented intermittently between March 23, 1987, and September 1, 1987.

We affirm 1) the district court's finding that Greater South Suburban Board of Realtors and National Association of Realtors (the Realtors) did not violate the Fair Housing Act in excluding South Suburban Housing Center's (SSHC) Apache Street homes from the Multiple Listing Service or in commencing disciplinary action against SSHC's realtor, William Motluck; 2) the trial judge's determinations that the Realtors lacked standing to pursue their Equal Protection claim against SSHC and Park Forest and that the affirmative marketing plan applicable to the Apache Street homes was permissible under the Fair Housing Act; 3) the district court's determinations upholding against First Amendment challenge the municipal ordinances of Country Club Hills, Matteson, Park Forest and University Park concerning the size, placement and number of "for sale" signs; and 4) the trial court's conclusion that the municipal ordinances of the City of Country Club Hills and the Villages of Hazel Crest, Matteson, Glenwood and Park Forest limiting solicitation did not violate the Fair Housing Act. We reverse the district judge's finding that the anti-solicitation ordinances of the above-mentioned municipalities violated the First Amendment and were unconstitutional because of vagueness. We also reverse the district court's conclusion that the Country Club Hills permit fee for the erection of "for sale" signs was free from constitutional infirmity. And we remand for further consideration the Realtors' claim that the Village of Glenwood's ban of "for sale" signs violated the Fair Housing Act, despite the eleventh-hour repeal of the same.

## I. FACTS

The municipal defendants are located in an area bordered on the north by the City of Chicago, on the west approximately by Harlem Avenue or Interstate 57, on the south roughly by Will County and on the east by the Indiana State line. The district court found that these formerly all-white suburbs have become integrated, but now face the threat of resegregation as a result of

"a complex mix of market forces. These market forces include racial prejudice: some whites and some blacks prefer to live in segregated communities; the belief that high concentrations of blacks result in a drop in home values; the expectation that an integrated community will eventually become segregated; and housing search practices that are

reinforced by certain real estate practices."

*South–Suburban Housing Center v. Greater South Suburban Board of Realtors,* 713 F.Supp. 1068, 1074 (N.D.Ill.1988). In order to stem the tide of these market forces and promote integrated housing patterns, the plaintiff, SSHC, "attempted to influence the housing market by encouraging the sales and marketing of real estate in what it terms to be 'non-traditional' ways, i.e., encouraging whites to move to black or integrated areas and blacks to move to white or integrated areas." *Id.* at 1075. A controversy between South–Suburban Housing Center and the Realtors over the propriety of SSHC making special efforts to market houses in black neighborhoods to white home buyers spawned the initial complaint in this litigation, which has resulted in the eight appeals consolidated herein.

The plaintiff, SSHC, is an Illinois, non-profit corporation whose "purposes are to 'promote and encourage multiracial communities in the South Suburbs' of Chicago and 'promote open housing to all people regardless of race.' " *Id.* at 1073. SSHC engages in a program of "affirmative marketing" of real estate, which "consists of race conscious efforts to promote integration or prevent segregation through special marketing of real estate to attract persons of particular racial classifications who are not likely to either be aware of the availability or express an interest in the real estate without such special efforts." *Id.* at 1075.

The defendants/counterplaintiffs are two realtor trade associations, the Greater South Suburban Board of Realtors (GSSBR) and the National Association of Realtors (NAR). The GSSBR is an Illinois, non-profit corporation which is an organization of licensed real estate brokers and salesmen operating in the south suburbs of Chicago. One of GSSBR's activities is the operation of a multiple listing service (MLS) in the south suburbs. The district court described the MLS as follows:

"[the] multiple listing service ('MLS') [is] a facility by which a MLS member broker makes a blanket unilateral offer of subagency to all other MLS participants with respect to a home listed with that broker. The MLS computer data base contains information about homes listed for sale with its members. MLS members and their home-seeking prospects can review this data via computer terminals or by reviewing printed compilations distributed to members on a bi-weekly basis."

*Id.* at 1077. The NAR is also an Illinois non-profit corporation and an organization of licensed real estate brokers that "provides policy guidance and materials and services of various sorts to its local affiliates, including the GSSBR." *Id.* at 1073.

The other litigants in this case are nine south suburban municipalities, the Cities of Blue Island and Country Club Hills and the Villages of Calumet Park, Glenwood, Hazel Crest, Matteson, Park Forest, Richton Park and University Park. These municipal defendants are parties to the suit as a result of ordinances they enacted either regulating real estate broker in-home solicitations or regulating the exhibition of real estate "for sale" signs. The Village of Park Forest also faces a legal challenge because of its alleged involvement with SSHC's efforts to "affirmatively market" to white individuals three homes South–Suburban Housing Center purchased from Park Forest.

The facts of this case deal with the following: 1) concerns over affirmative marketing, 2) limitations on real estate broker solicitation and 3) restrictions on "for sale" signs.

## A. Affirmative Marketing

This action originated as a result of the Realtors' reaction to South–Suburban Housing Center's attempts to promote a racial balance in the Village of Park Forest through making special efforts to interest white home buyers in property there. The current racial imbalance came about during the 1970s when many black families moved into an area in the northeast corner of the Village of Park Forest, Illinois known as the Eastgate subdivision. At the time of

the 1980 census, the census block including the homes at issue here had become more than fifty-six percent black, more than double the black population of any other census block in the Eastgate subdivision. As a result of the area's reputation as "a black block," few white families were interested in buying property. The area became less attractive to home buyers as VA and FHA mortgage foreclosures led to abandoned homes and neighborhood blight. *See South–Suburban Housing Center*, 713 F.Supp. at 1076. In response to the problem of abandoned homes in the Eastgate subdivision, in 1982 the Village of Park Forest instituted a program of purchasing vacant or abandoned homes for rehabilitation and resale, including vacant homes at numbers 9, 15 and 26 Apache Street. SSHC submitted a proposal, which included affirmative marketing, to Park Forest for the acquisition, rehabilitation and resale of these three homes.

After the Park Forest Board of Trustees accepted the proposal and sold the homes to the South–Suburan Housing Center, the SSHC agreed to list the homes for sale with Century 21–Host Realty through one of its salesmen, William H. Motluck. The parties utilized a standard real estate contract form with the exception of provisions that Century 21–Host Realty was "to implement the affirmative marketing plan attached as appendix." In addition to securing a buyer, Century 21–Host Realty's receipt of a commission was conditioned upon its "performance of the attached affirmative marketing plan."

The affirmative marketing plan (AMP) directed that the realtor "use its best efforts to attract minority and majority groups persons" to the particular Apache Street home, and stated that the SSHC and the Realtor "agree that white home seekers are not likely without special outreach efforts to be attracted to the Apache St. home." The AMP also provided that the Realtor would use "the following special outreach activities to attract white home seekers to the Apache Street home:

A. Placement of advertisements in newspapers with a predominantly white circulation;

B. Distribution of information to selected rental developments; and

C. Distribution of information to selected employers."

The Plan also provided that "Realtor shall not take any action which prohibits, restricts, narrows or limits the housing choice of any client on the basis of race." Century 21 was further required to maintain "a list of all persons, by race, who are shown the Apache Street home...."

The Realtors became involved when Century 21–Host Realty listed the Apache Street homes with GSSBR's multiple listing service. The AMP created a conflict between Century 21 salesperson William Motluck and the Realtors, as the Realtors believed it was inappropriate under the fair housing laws to affirmatively market homes to one particular race, in this instance whites, in the absence of prior discrimination. Motluck initially became aware of the problem when he received a letter from GSSBR asserting that its legal counsel was concerned with the legality of the affirmative marketing plan and furthermore that it was contrary to the voluntary affirmative marketing agreement entered into between HUD and the National Association of Realtors. Motluck upon being so advised asked for a copy of GSSBR's legal counsel's opinion. Rather than forward a copy of the opinion, they sent Motluck a letter stating that the provision requiring advertising in newspapers with a predominantly white circulation "provides for racial steering and is in violation of current Federal law." The letter further opined that the data collection provisions of the AMP are "in direct violation of the Multiple Listing rules ... [and] may constitute a combination in restraint of trade under the Sherman Anti[-]Trust Act."

On the basis of Century 21's agreement to implement the affirmative marketing plan, GSSBR's private Equal Opportunity Commission (EOC) voted to file a complaint against Motluck under Article 10 of the

NAR's Code of Ethics [1] with the Professional Standards Committee of the Illinois Association of Realtors.

"The EOC voted to file its complaint against Motluck because the Apache Street agreements called for 'special outreach ... to whites rather than to minorities.' The EOC's position, based upon the HUD/NAR [voluntary affirmative marketing agreement], was that special outreach to white home seekers gave rise to a violation of Article 10."

*South–Suburban Housing Center,* 713 F.Supp. at 1078 (citations omitted). After conducting a hearing, the Professional Standards Committee determined that there was insufficient evidence to hold Motluck liable for a violation of Article 10, as, in the words of the counsel for the hearing panel, "the evidence produced at the hearing indicated that [in attempting to market the Apache Street homes, Motluck] did nothing other than he normally did in the operation of his office in processing the listing which he obtained conditioned upon the affirmative marketing plan."

After the EOC decided to file its complaint against Motluck, Robert Turpin, the person responsible for the administration of GSSBR's multiple listing service, withdrew the three Apache Street homes from the MLS. (Turpin was present at the EOC meeting). Subsequently, GSSBR proposed to condition the listing of the homes in its multiple listing service upon Century 21's and SSHC's agreement to indemnify GSSBR and its member realtors from damages, costs or attorneys' fees which might be incurred as a result of any legal proceedings that might result from the AMP. The Realtors' justification for the indemnification requirement was a belief that

"the listings could lead to 'legal liability' or 'potential exposure' of the MLS or MLS participants under legal prohibitions against steering.

"The justification advanced by defendants for thus conditioning MLS access for the Apache Street listings was [William] North's [then Senior Vice–President and General Counsel of NAR] asserted belief that the listings called for actions which 'likely' were racial steering and therefore could lead to 'legal liability' or 'potential exposure' for the MLS or MLS participants."

*Id.* at 1078–79. The court found that "this justification was made in good faith and was not a pretense for discrimination." *Id.* at 1079.

SSHC asserts that the Realtors' removal of the Apache Street properties from the multiple listing service as well as the decision to file a complaint against Motluck because of the AMP's requirement of directing special sales efforts toward white home buyers violated Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* (the Fair Housing Act) in that it discriminated "on account of race." The district court concluded as a matter of law that the Realtors neither intended to discriminate against SSHC nor did their actions have a discriminatory effect. Thus, the court found no violation of the Fair Housing Act. *Id.* at 1079–80.

### B. Anti–Solicitation Ordinances

The second major area of the parties' litigation concerned the propriety of municipal ordinances prohibiting real estate brokers from soliciting real estate listings from persons who had stated their unreceptiveness to receiving solicitations. The City of Country Club Hills and the Villages of Glenwood, Hazel Crest and Matteson, Illinois have enacted ordinances regulating realtor solicitation that are similar to one another.[2] The Hazel Crest ordinance reads as follows:

"No person shall solicit any owner or occupant of a dwelling to sell or rent, or list for sale or rental, such dwelling at persons on the basis of race, creed, sex, or country of national origin."

---

1. Article 10 provides:
 "The Realtor shall not deny equal professional services to any person for reasons of race, creed, sex, or country of national origin. The Realtor shall not be party to any plan or agreement to discriminate against a person or

2. The Village of Park Forest has also enacted an anti-solicitation ordinance, the provisions of which are addressed in footnote 7, *infra.*

any time after such owner or occupant has notified the Hazel Crest Village Clerk that he does not desire to be so solicited.

"The Clerk shall publish and make available, without charge, appropriate forms which may be executed by any owner or occupant of a dwelling to provide such notice. The Clerk shall prepare a list of the names and addresses of such owners and occupants and shall publish the same as follows:

A. By maintaining a copy of said list in the office of the Village of Hazel Crest Clerk and making it available for inspection;

B. By furnishing a copy of said list annually to every real estate firm belonging to the local multiple-listing service;

C. By furnishing a copy of said list upon request and payment of reproduction cost to any person having an interest in the sale or rental of any dwelling in the Village of Hazel Crest.

"In addition, any owner or occupant of a dwelling may notify, in writing, any real estate agent that such owner or occupant does not desire to be solicited. Upon such notice a real estate agent shall not solicit such owner or occupant to sell or rent, or list for sale or rental, such dwelling."[3]

The ordinances of all four municipalities define "solicit" or "solicitation" as follows:

" 'Solicit' or 'solicitation' means any communication by or on behalf of a real estate agent with the owner or occupant of a dwelling (i) which is intended to induce the sale, rental or listing for sale or rental of such dwelling; (ii) which is intended to offer or promote services in connection with the sale, rental or listing of such dwelling; and (iii) which is carried out by means of:

(a) in-person contacts at the dwelling;

(b) written material mailed or delivered directly to the dwelling, such as direct mail, leaflets or pamphlets; or

(c) telephonic contacts with owners or occupants of the dwelling.

"For purposes of this Ordinance the term 'solicit' or 'solicitation' shall not refer to communication carried out by means of print or electronic media of general circulation, such as a newspaper, radio, television or the yellow pages."[4]

The ordinances of the four municipalities considered in this section closely resemble the State of Illinois' restrictions upon real estate brokers' solicitation of unwilling persons that are contained in Ill.Rev.Stat. ch. 38 ¶ 70–51(d), whose constitutionality we sustained in *Curtis v. Thompson*, 840 F.2d

---

3. A comparison of the anti-solicitation ordinances in the four south suburban municipalities of Country Club Hills, Glenwood, Hazel Crest and Matteson reveals that the Hazel Crest ordinance and the Matteson ordinance are virtually identical. The Country Club Hills ordinance is the same as the other ordinances except that it provides that the Clerk shall compile lists both alphabetically and by street address and that additions and deletions from the list sent annually to real estate agents shall be posted quarterly in the Country Club Hills City Hall. The Glenwood Ordinance is also similar to the other ordinances with the exception that it provides that additions and deletions from the no-solicitation list are mailed or delivered to real estate agents quarterly.

4. Matteson, Country Club Hills, Glenwood and Hazel Crest each adopted this definition as an amendment to their no-solicitation ordinances in 1986 or in 1987. The former, less specific definition of solicitation gave rise to legal challenges based upon vagueness. In *Penny Saver Publications, Inc. v. Village of Hazel Crest*, 905

F.2d 150, 155 (7th Cir.1990), we concluded that the former definition of solicitation contained in the Hazel Crest ordinance, that provided that solicitation was "any conduct by a real estate agent or any employee or agent thereof intended to induce the owner of a dwelling within the village to sell, rent or list the same for sale or rental," was unconstitutionally vague. We based this conclusion on the ordinance's "fail[ure] to clearly define whether the Penny Saver's real estate advertisements came within the realm of the definition [of solicitation]." *Id.* We made clear in *Penny Saver* that we were not construing the validity of the amended ordinance, noting that: "The amended Ordinance is presently under review by this Court in *South Suburban Housing Center v. Greater South Suburban Board of Realtors*, 713 F.Supp. 1068 (N.D. Ill.1988), *appeal docketed*, Nos. 89–2115, 89–2112, 89–2123, and 89–2218 (7th Cir. argued Feb. 15, 1990), and we do not touch on its constitutionality in this decision." *Id.* at 153.

1291 (7th Cir.1988).[5] One difference between the ordinances of the four municipalities and the state statute is that the municipal ordinances call for the city or village not only to compile but also to publish the non-solicitation list. The other differences are that the municipal ordinances are more limited in that they specifically define "solicit or solicitation," restrict their application to types of contacts that occur in the home or a residence and provide for fines only.

The trial court found that the municipalities had two bases for their anti-solicitation ordinances. First, the ordinances are

"based on the desire to protect residents from exposure to advertising because this information might cause homeowners to question the racial stability of their communities or re-evaluate their decisions to live there. As with 'for sale' sign bans, the ordinances are designed to keep residents from moving, to maintain the status quo and to reduce the ability of homeseekers to find homes in the municipalities." [6]

The second "purpose of the anti-solicitation ordinances is to provide a method for a resident to obtain a measure of privacy by avoiding annoying and intrusive inquiries about residential plans." *South–Suburban Housing Center*, 713 F.Supp. at 1094. Although the Realtors urge that the "no solicitation" ordinances violated the Fair Housing Act in that they had a discriminatory impact upon black individuals, the trial court stated that "the record is devoid of substantial evidence tending to show that the ordinances were intended to discriminate against blacks or any other racial group," or that the "ordinances have had a racially discriminating effect." *Id.* at 1094.

Shortly before trial each of the four municipalities involved sent almost identical letters to real estate brokers which stated that:

"[T]he terms 'solicit' or 'solicitation' in the ordinance include any business or promotional communication by a real estate agent to a homeowner in his or her home which is not carried out by media of general circulation, and the Village will treat such a communication to a resident on the list as a violation of the Ordinance." [7]

**5.** The text of that statute reads as follows:
"It shall be unlawful for any person or corporation knowingly:

\* \* \* \* \* \*

"(d) To solicit any owner of residential property to sell or list such residential property at any time after such person or corporation has noticed that such owner does not desire to sell such residential property. For the purpose of this subsection, notice must be provided as follows:

"(1) The notice may be given by the owner personally or by a third party in the owner's name, either in the form of an individual notice or a list, provided it complies with this subsection.

"(2) Such notice shall be explicit as to whether each owner on the notice seeks to avoid both solicitation for listing and sale, or only for listing, or only for sale, as well as the period of time for which any avoidance is desired. The notice shall be dated and either of the following shall apply: (A) each owner shall have signed the notice or (B) the person or entity preparing the notice shall provide an accompanying affidavit to the effect that all the names on the notice are, in fact, genuine as to the identity of the persons listed and that such persons have requested not to be solicited as indicated.

"(3) The individual notice, or notice in the form of a list with the accompanying affida-

vit, shall be served personally or by certified or registered mail, return receipt requested."

**6.** *South–Suburban Housing Center*, 713 F.Supp. at 1093. The trial court went on to find that: "Wide spread solicitation by real estate brokers and salesmen, similar to the 'for sale' sign proliferation, is widely perceived to be destabilizing to an integrated community. The anti-solicitation ordinances are designed to make solicitation more difficult and expensive." *Id.* at 1094 (citation omitted).

**7.** Park Forest also has an ordinance providing for the village clerk to maintain and publish a list of those persons who did not desire solicitations. The major difference between the Park Forest ordinance and the remaining four ordinances is in its definition of "solicitation" which reads:

"*Solicitation* means any conduct (excluding advertisement in newspapers, magazines or broadcast media of general circulation) designed or intended to induce the owner of any real property (as herein above defined) to sell, rent, exchange, convey, transfer or list for sale or rental such real property."

Although not identical to the definitions in the remaining ordinances, the district court observed that this definition was "substantially similar" to the definition contained in the

The trial court held that this definition including every business communication "not carried out by media of general circulation" "despite the ordinances' requirement that a communication must be *intended to induce a sale or listing for sale*," rendered the ordinances constitutionally invalid: "The text of the ordinances provide insufficient warning that 'indirect' solicitation is prohibited and thus they are unconstitutionally vague." *Id.* at 1096 (emphasis original).

## C. Real Estate For Sale Signs

Four municipalities in the south suburbs have enacted limitations on the display of real estate "for sale" signs. The City of Country Club Hills and the Villages of Matteson and Park Forest regulate the size of these signs. These three municipalities as well as the Village of University Park have enacted regulations on the number of "for sale" signs that may be displayed on a piece of real estate as well as the placement of the signs.

Each of the municipalities that regulate the size, number and placement of "for sale" signs states in the preamble or in the text of the ordinance that its purpose is to advance the aesthetics of the community. The district court made a factual finding that there was "little evidence that the sign regulations resulted in measurable lost income for realtors, that the regulations had a discriminatory impact on black home seekers, or that they denied access to housing to anyone." *South–Suburban Housing Center*, 713 F.Supp. at 1090–91. Thus, the court held that the ordinances do not violate the Fair Housing Act. The trial judge further rejected the Realtors' constitutional challenge to the ordinances on the basis that "they are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest and they leave

open ample alternative channels for communication of the information." *Id.* at 1093.

Country Club Hills is the only one of these municipalities that further requires that persons displaying a "for sale" sign obtain a city permit costing $60.00 for a six month period. The Realtors' claim is that this fee exceeds the costs of administering the City's regulations. Although neither the parties nor the district court cite to any specific dollar figures which are attributable to the administration and enforcement of the "for sale" sign permit program, the district court found that "[t]here was no evidence that the fees charged exceeded the administration costs." *Id.* at 1103.

In contrast to the other municipalities regulating real estate "for sale" signs, Glenwood, Illinois enacted an ordinance enforcing a ban on these signs in 1972. Prior to 1982 Glenwood ceased enforcing its sign ban as a result of the Supreme Court's decision in *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), which sharply curtailed a municipality's ability to enforce a ban on "for sale" signs. In spite of the advice of Glenwood's village attorney that enforcement of a sign ban would be unconstitutional, Glenwood again decided to enforce its ordinance prohibiting "for sale" signs on March 1, 1984. On the advice of its counsel, Glenwood repealed its "for sale" sign ban just prior to trial. Even though the issue of Glenwood's enforcement of its ban on "for sale" signs was raised in the pleadings and was the subject of evidence introduced at trial, the district court failed to make specific findings of fact or conclusions of law regarding the issue. But, we hasten to point out that the Realtors failed to call this issue to the court's attention at trial much less challenge the lack of specific findings and con-

---

amended ordinances of the other municipalities. Park Forest's status before us also differs from the other four municipalities in that it did not send a letter to realtors broadly defining the term "solicitation" to include even indirect soliciting through media of general circulation. The district court nonetheless found as a fact that each of the municipalities (apparently in-

cluding Park Forest), "interpret their ordinances to ban all business communication mailed or delivered by real estate brokers, even if their intended purpose was only to generate good will, such as holiday calendars, birthday greetings, the sales of investment or vacation property, or to find buyers or referrals." *South–Suburban Housing Center*, 713 F.Supp. at 1094.

clusions of law in their post-trial motions in the district court.

## II. THE REALTORS' CHALLENGE TO THE APACHE STREET AFFIRMATIVE MARKETING PLAN

The Realtors contend that SSHC and Park Forest violated the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in initiating the affirmative marketing plan for the three Apache Street homes. The trial court held that the Realtors lacked standing to pursue the equal protection claim because the "equal protection claim ... rest[s] on legal rights of minority home buyers rather than those of homesellers." *South–Suburban Housing Center,* 713 F.Supp. at 1089–90. The court reached the merits of the Realtors' Fair Housing Act challenge and held that neither SSHC nor Park Forest violated the Act during the marketing of the Apache Street homes.[8]

### A. The Realtors' Standing

Park Forest contends that the court erred in concluding that the Realtors possessed standing to bring their Fair Housing Act claim, while the Realtors urge that the trial court erred in holding that they lacked standing to pursue their equal protection claim.

■ In *Penny Saver Publications, Inc. v. Village of Hazel Crest,* 905 F.2d 150, 154 (7th Cir.1990), we observed that:

> "The first element of the standing inquiry that [a plaintiff] 'must satisfy in this Court is the "case" or "controversy" requirement of Art. III of the United States Constitution.' *Secretary of State of Maryland v. J.H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1983). The relevant inquiry for a case or controversy is to determine whether a plaintiff has shown an injury to himself that is likely to be redressed

by a favorable decision. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38 [96 S.Ct. 1917, 1924, 48 L.Ed.2d 450] (1976)."

Indeed, other than the requirement that the purported injury must be "likely to be redressed by a favorable decision,"[9] injury in fact is the only requirement to achieve standing under the Fair Housing Act, for the United States Supreme Court has held that:

> "'Congress intended standing under § 812 [of the Fair Housing Act] to extend to the full limits of Art. III' and ... the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section. [*Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103, n. 9 [99 S.Ct. 1601, 1609, n. 9, 60 L.Ed.2d 66] (1979) ]. Thus, the sole requirement for standing to sue under § 812 is the Art. III minima of injury in fact: that the plaintiff alleged that as a result of the defendant's actions he has suffered 'a distinct and palpable injury,' *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)."

*Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982).

■ The Realtors assert that they suffered an injury in fact based upon their role as the representative of the individual interests of their member realtors. As this case demonstrates, the Realtors have interpreted the AMP as applied to the Apache Street homes to be in violation of the fair housing obligations and the Realtors' code of ethics. Thus, the threat of professional discipline inhibits member realtors from handling the listings involved. We are convinced that as organizations responsible for advancing both the professional ethics and the economic well being of the individual realtors, the Realtors have suffered an injury in fact as a result of the damage

---

8. Before the trial court, the Realtors also urged that Park Forest and SSHC violated 42 U.S.C. § 1982. The Realtors abandoned this claim on appeal.

9. Park Forest has not challenged the redressability of the Realtors' alleged injury. Furthermore, if the Realtors were to receive a favorable decision from this court, the injuries of which they complain would be removed.

occurring to member realtors from their inability to handle the Apache Street listings. Thus, under *Havens,* the Realtors' assertion of a redressible "injury in fact" is sufficient to provide them with standing to pursue their Fair Housing Act claim. *Accord Gorski v. Troy,* 929 F.2d 1183, 1188–1189 (7th Cir.1991) ("Congress intended standing under the FHA 'to extend to the full limits of Art. III....' " (Quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9)).

■] In addition to demonstrating "injury in fact," the Realtors must also satisfy prudential standing concerns in order to pursue their claim based upon the equal protection rights of potential black home buyers.

> "When a person or entity seeks standing to advance the constitutional rights of others, we ask two questions: first, has the litigant suffered some injury in fact, adequate to satisfy Article III's case-or-controversy requirement; and second, do prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim?"

*Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989).

The trial judge concluded that the Realtors lacked standing to litigate the equal protection claims because "[a]n equal protection claim would clearly rest on legal rights of minority home buyers rather than those of home sellers." *South–Suburban Housing Center,* 713 F.Supp. at 1089–90. Upon our examination of the Realtors' equal protection contentions, we are convinced that the rights asserted in the complaint can only be classified as those of minority home buyers rather than those of the Realtors themselves in that the claim is phrased in language which states that the affirmative marketing plan violates the equal protection rights of potential minority home buyers. Thus, the Realtors are without standing to pursue this alleged injury to minority home buyers unless the Realtors fall somehow within an exception to the prudential rule against third-party standing.

The Supreme Court has recognized that the prudential rule against standing to assert the constitutional rights of third persons, "[l]ike any general rule ... should not be applied where its underlying justifications are absent." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (plurality opinion). In determining third-party standing courts are to consider "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third-party interests." *Caplin & Drysdale, Chartered,* 109 S.Ct. at 2651 n. 3.

■] In examining the relationship between the Realtor litigants and the potential black home buyers whose rights they seek to vindicate, we must examine "whether the enjoyment of the [potential home buyer's] right is inextricably bound up with the activity the litigant wishes to pursue." *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2874 (plurality opinion). Unlike *Caplin & Drysdale,* where the attorney's right to a fee was bound up with a specific client's claim that forfeiture of his assets interfered with his Sixth Amendment right to counsel, or *Singleton,* where the physician's interest in payment for his abortion services was closely associated with the patient's alleged right to government payment for an abortion, the Realtors have failed to demonstrate a true relationship between their interest in pursuing particular real estate marketing practices and the constitutional rights of specific potential black home buyers. *Cf. Rothner v. City of Chicago,* 929 F,2d 297, 301 (7th Cir.1991) (permitting distributor and operator of video games to pursue alleged First Amendment challenge of ordinance prohibiting minors from playing video games between 8:00 a.m. and 3:00 p.m. on days when the city's schools are in session). Indeed the record clearly establishes that the Realtors have been unable to point to a single minority home buyer who was deprived of his or her equal protection rights as a result of

the Apache Street affirmative marketing plan. *See South–Suburban Housing Center,* 713 F.Supp. at 1088 ("[Realtors] offered no evidence respecting any persons who sought to purchase or rent homes and who were denied that right by the SSHC, or that the SSHC denied or made housing available to anyone, or in any way restricted or limited anyone's housing choice....").

The relationship between the Realtors and black home buyers does not reflect the similarity in interest which would lead to the conclusion that "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the [constitutional] right as the latter." *Singleton,* 428 U.S. at 115, 96 S.Ct. at 2874 (plurality opinion). Although the Realtors have a strong philosophical commitment to a housing market in which equal opportunity is realized solely through "color blind" marketing, since no potential black home buyers are involved in this suit, it is unclear as to whether their priorities are similar. One of the prudential reasons for the rule against third party standing is that "the courts should not adjudicate [constitutional] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not." *Singleton,* 428 U.S. at 113–14, 96 S.Ct. at 2874 (plurality opinion). We refuse to address the constitutional issue of an equal protection violation until such time as it is presented by a potential home buyer, as we, like the Supreme Court, believe that "third parties themselves usually will be the best proponents of their own rights." *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2874 (plurality opinion).

The second potential exception to the rule against third party standing turns upon the "ability of the [third party] to advance his own rights,"[10] and whether "there is some genuine obstacle to [the

personal] assertion"[11] of the constitutional right. We are unable to discern anything in the record that would prevent black home buyers from filing a constitutional challenge to an affirmative marketing program directed toward white home buyers. Thus, the exception relating to third parties who are unable to effectively assert their own rights fails to aid the Realtors in their quest for standing to assert their equal protection claim.

The final factor considered in determining whether an exception to the rule against third party standing is warranted is "the impact of the litigation on third-party interests." *Caplin & Drysdale,* 109 S.Ct. at 2651 n. 3. Based on the record before us, we are not in a position to determine whether potential black home buyers would desire the Apache Street AMP to be invalidated, thereby decreasing competition from white home buyers for these properties; nor are we able to ascertain whether they would want the affirmative marketing plan upheld in order to promote developing and maintaining an integrated community in Park Forest. Hence, we are unconvinced that allowing the Realtors to assert the equal protection claim would, in fact, further the interests of potential black home buyers.

We conclude that while the Realtors have fulfilled the injury in fact requirement for bringing their Fair Housing Act challenge to the Apache Street affirmative marketing program, they have failed to overcome the prudential limitations on standing that preclude them from asserting the equal protection-based constitutional claims of black home buyers.

### B. Mootness

■■■] Both Park Forest and SSHC urge that the 1985 sale of the three Apache Street homes has rendered moot the Realtors' Fair Housing Act challenge to the Apache Street affirmative marketing plan.[12] The Realtors' Fair Housing Act

---

10. *Caplin & Drysdale,* 109 S.Ct. at 2651 n. 3.

11. *Singleton,* 428 U.S. at 116, 96 S.Ct. at 2875 (plurality opinion).

12. Although the homes were sold prior to trial, Park Forest and SSHC for some reason did not raise their mootness challenge in the district court. Because a moot action does not satisfy

challenge to the Apache Street Plan requests damages and declaratory relief in addition to injunctive relief. In *Penny Saver*, we held that although a subsequent development (amendment of a challenged ordinance) had rendered a request for injunctive relief moot:

"This is not to say that Penny Saver's entire action is moot. Rather, Penny Saver still has a viable claim for declaratory and monetary relief. The fact that the Ordinance has been amended subsequent to the commencement of this case 'does not moot plaintiff's claim for either declaratory or monetary relief.' *Black v. Brown*, 513 F.2d 652 (7th Cir.1975) (new regulations adopted by prison officials do not moot declaratory or monetary claim on the original regulations). As the Supreme Court concluded in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 713, 102 L.Ed.2d 854 (1989), the expiration of an ordinance does not render the controversy moot because there still remains a live controversy between the parties as to whether the ordinance was unlawful thus entitling the plaintiff to damages. The Court has also previously stated 'that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.' *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *See also Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 8–9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (respondent's claim for actual and punitive damages arising from termination of service saves this cause from the bar of mootness); *Powell v. McCormack*, 395 U.S. 486, 499, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491 (1969) ('A court may grant declaratory relief even though it chooses not to issue an injunction' because that claim is moot.)"

the case or controversy requirement of Article III of the Constitution, *see Air Line Pilots Association, Int'l v. UAL Corp.*, 897 F.2d 1394, 1396–97 (7th Cir.1990), the mootness claim is a "nonwaivable question of subject matter jurisdic-

905 F.2d at 153. Hence, the Village's amendment of its ordinance after the suit had been filed failed to invalidate Penny Saver's claims. Likewise, the sale of the three Apache Street homes after the initiation of this case fails to moot the Realtors' claims for damages. Thus, the Realtors' action is not moot, and a case or controversy exists over which we may properly exercise subject matter jurisdiction.

## C. The Realtors' Fair Housing Act Claims

The Realtors allege that SSHC and Park Forest violated sections 804(a) and 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(a) and (c), in promulgating and implementing the Apache Street affirmative marketing plan. These sections provide as follows:

"As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

\* \* \* \* \* \*

"(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination."

The trial court determined that SSHC and Park Forest did not violate the Fair Housing Act in their implementation of the Apache Street Plan. *See South–Suburban Housing Center*, 713 F.Supp. at 1087–88.

tion...." *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1525 (7th Cir.1990) (Article III-based standing issue). Thus, mootness may properly be asserted on appeal.

### 1. 42 U.S.C. § 3604(a)

■ We turn to the Realtors' claim that SSHC and Park Forest violated 42 U.S.C. § 3604(a), which prohibits the "refus[al] to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." The Fair Housing Act is concerned with both the furtherance of equal housing opportunity and the elimination of segregated housing. As we observed in *Southend Neighborhood Improvement Association v. County of St. Clair*, 743 F.2d 1207, 1209–10 (7th Cir. 1984):

> "The Fair Housing Act prohibits both direct discrimination and practices with significant discriminatory effects. For example, although Section 3604(a) applies principally to the sale or rental of dwellings, courts have construed the phrase 'otherwise make unavailable or deny' in subsection (a) to encompass mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions by individuals or governmental units which directly affect the availability of housing to minorities. Of course, *the alleged illegal actions must lead to discriminatory effects on the availability of housing. The Act is concerned with ending racially segregated housing. Section 3604(a) applies to the availability of housing.* That section thus is violated by discriminatory actions, or certain actions with discriminatory effects, that affect the availability of housing."

(Emphasis added) (footnote and citations omitted). The Realtors argue that the affirmative marketing plan furthers the goal of "ending racially segregated housing" at the expense of limiting the "availability of housing" for black people. They assert that this alleged subordination of equal housing opportunity to the goal of integration is invalid, just as the courts held in *United States v. Starrett City Associates*, 840 F.2d 1096 (2d Cir.), *cert. denied*, 488 U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988), and *United States v. Charlottesville Redevelopment and Housing Authority*, 718 F.Supp. 461 (W.D.Va.1989).

In *Starrett City*, owners of a government subsidized housing development sought to maintain an ethnic distribution of tenants in their project consisting of sixty-four percent white persons, twenty-two percent black persons and eight percent hispanic persons through a "tenanting procedure" that filled apartment vacancies with "applicants of a race or national origin similar to that of the departing tenant...." 840 F.2d at 1098. In *Charlottesville*, a "tenant selection policy ... gave preferential treatment to white applicants for public housing," based upon an intent to "achieve a 50/50 mix of black and white residents in ... public housing." 718 F.Supp. at 462. The courts determined that each of these "quota" programs violated the Fair Housing Act. In *Charlottesville*, the court recognized that the Fair Housing Act's twin purposes of eliminating discrimination in housing and furthering integration in housing are both important, but may occasionally be incompatible:

> "The legislative history of the Fair Housing Act suggests to this court that the prime focus or the 'quickening' force behind that legislation is prohibition of discrimination in the provision of housing, but also that integration was seen by the creators of that legislation as a prominent goal and a value of great worth. From the perspective of over two decades, it is perhaps excusable to find the unexamined assumption in the Act's legislative history that the principles of nondiscrimination and integration will always necessarily go hand in hand. With our later perspective, that assumption may be unfounded, but it does not detract from the observation that this legislation was created with both legal (and moral) principles in mind, although primary weight is given to the prohibition of discrimination. However, cases such as *Trafficante [v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) ] illustrate that the legal principle of integration and concern for the achievement of that goal cannot be considered mere surplusage."

718 F.Supp. at 467. The court determined that Charlottesville's "quota" program presented a conflict between the Act's purposes of nondiscrimination and integration, and held that:

"In the present conflict between these two legal principles, nondiscrimination and integration, the obligation of [the Charlottesville Redevelopment and Housing Authority (CRHA) ] to avoid discrimination must 'trump' CRHA's obligation to promote integration, as regards the promotion of integration through the specific policy mechanism and controversy before this court. It is not that this court ascribes to integration a status inferior to nondiscrimination in the pantheon of legal values. It is, rather, that the duty to avoid discrimination must circumscribe the specific particular ways in which a party under the duty to integrate can seek to fulfill that second duty."

718 F.Supp. at 468. Similarly, the Second Circuit in *Starrett City* held that while integration maintenance with its concern over

"the 'white flight' phenomenon may be a factor 'take[n] into account in the integration equation,' *Parent Ass'n of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 720 (2d Cir.1979), it cannot serve to justify attempts to maintain integration at Starrett City through inflexible racial quotas that are neither temporary in nature nor used to remedy past racial discrimination or imbalance within the complex."

*Starrett City*, 840 F.2d at 1102. Thus, *Starrett City* and *Charlottesville* both mandate the conclusion that an interest in racial integration alone is insufficient to justify a racial quota system which favors whites and thereby lessens housing opportunities for minorities.

In contrast to the subordination of the goal of equal housing opportunity to the goal of integration presented by the facts in *Starrett City* and *Charlottesville*, the Realtors' challenge to the Apache Street affirmative marketing plan presents the question of whether a real estate organization may engage in limited race conscious marketing which does not exclude minorities from housing opportunities. Thus, we are not dealing with conflicting goals, for the affirmative marketing plan furthers the goal of integration while providing equal opportunities to all.

Essentially, the Realtors' contention is that the AMP constitutes invalid "steering" of blacks from Park Forest in that it "deterred blacks from buying on Apache Street and in Park Forest generally by directing essential information about housing availability away from blacks and towards whites, and by stigmatizing black residents and home seekers." This Court has not previously addressed the question of whether an attempt to interest white homeowners in property located in an area of predominant interest to black home buyers constitutes "steering" violative of the Fair Housing Act. However, we recently addressed the analysis applicable to an allegation of more traditional, non-benign "steering" in *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529–30 (7th Cir. 1990):

"The mental element required in a steering case is the same as that required in employment discrimination cases challenged either under Title VII of the Civil Rights Act of 1964 (and section 3604 is part of the same Act) or under 42 U.S.C. § 1981 (the standard of liability in which is similar to that in Title VII, *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1420 (7th Cir.1986)) on a theory of disparate treatment. 'Disparate treatment' means treating a person differently because of his race; it implies consciousness of race, and a purpose to use race as a decision-making tool. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). 'Proof of discriminatory motive is critical' in a Title VII disparate treatment case, 'although it can in some situations be inferred from the mere fact of differences in treatment.' *Id.*"

■ In analyzing the question of whether directing information to predominantly

white audiences concerning the Apache Street homes violates the Fair Housing Act, we must recognize that these homes likely would have been primarily of interest to black home buyers. But SSHC's affirmative marketing plan in no way deters black home buyers from pursuing their interest in the Apache Street homes; it merely creates additional competition in the housing market. If the AMP resulted in realtors "refusing to show properties because of the race of the *customer,* or misleading the *customer* about the availability of properties because of his race, or cajoling or coercing the *customer* because of his race to buy this property or that or look in this community rather than that," *id.* at 1530, we would agree that racial steering may possibly have been involved. In the absence of concrete evidence of this nature, however, we see nothing wrong with SSHC attempting to attract white persons to housing opportunities they might not ordinarily know about and thus choose to pursue.

The district court explicitly found that:

"The SSHC's stated purpose in entering into and implementing the Apache Street listings was to add some 'white traffic to the properties in addition to the black traffic,' not to decrease or restrict the black traffic. The relevant evidence supports a finding that that was in fact the SSHC's purpose."

*South–Suburban Housing Center,* 713 F.Supp. at 1085. With respect to the ultimate factual finding of whether the Realtors had proven intentional discrimination, the trial court found:

"Since counterplaintiffs offered no evidence respecting any persons who sought to purchase or rent homes and who were denied that right by the SSHC, or that the SSHC denied or made housing available to anyone, or in any way restricted or limited anyone's housing choice, the court concludes that the coun-

terplaintiffs have failed to prove an 'intent' case under the Fair Housing Act." *Id.* at 1088. The record contains neither cases of particular adversely affected black home buyers nor statistical evidence that would lead us to conclude that the trial court's finding of an absence of intentional discrimination was clearly erroneous.

In addition to furthering the Fair Housing Act's goal of integration, we are of the opinion that the AMP also advances the purpose of the Act through making housing equally available to all by stimulating interest among a broader range of buyers. Furthermore, this marketing may simply be a wise business move in that it stimulates interest in housing among new and/or potential customers. We disagree with the Realtors' argument that increased competition among black and white home buyers for the same homes constitutes a violation of the Fair Housing Act. Instead, this is precisely the type of robust multi-racial market activity which the Fair Housing Act intends to stimulate. Because the Apache Street affirmative marketing plan merely provided additional information to white home buyers concerning properties they might not ordinarily know about nor consider, and involved no lessening of efforts to attract black home buyers to these same properties, we conclude that the plan was not in violation of 42 U.S.C. § 3604(a).[13]

### 2. 42 U.S.C. § 3604(c)

The Realtors go on to argue that SSHC and Park Forest violated 42 U.S.C. § 3604(c) because the promulgation of the Apache Street AMP constituted the publication of a statement indicating a preference based on race or color or an intention to make such a preference. As discussed previously, the Apache Street AMP merely directs additional promotional and advertising toward a racial group that would normally have little interest in the respective homes. It contains no racial quota or other

---

13. We would also note that there was some evidence in the record that, as a result of the problems arising from the litigation involving the AMP, William Motluck of Century 21–Host Realty was unable to carry out the provisions of the affirmative marketing plan and, thus, did

nothing other than what he would have ordinarily done in marketing the Apache Street homes. Obviously, if this is true, there is no basis to conclude that the implementation of the Apache Street AMP violated 42 U.S.C. § 3604(a).

provision purporting to make race a factor in a decision concerning who would be permitted to see or purchase the Apache Street homes. Thus, we are of the opinion that the Apache Street plan was not an improper statement of racial preference under 42 U.S.C. § 3604(c).

## III. SSHC's CHALLENGE TO THE REALTORS' CONDUCT RESPONDING TO THE APACHE STREET AFFIRMATIVE MARKETING PLAN

SSHC appeals from the trial court's conclusions of law that 1) the Realtors did not violate 42 U.S.C. § 3606 when they initially excluded the Apache Street homes from the GSSBR multiple listing service and later required indemnification as a pre-condition to the inclusion of the listings, and 2) that the Realtors did not transgress 42 U.S.C. § 3617 as a result of the above behavior together with the disciplinary proceedings commenced against William Motluck, the real estate broker who attempted to sell the Apache Street homes.[14]

### A. 42 U.S.C. § 3606

Section 806 of the Fair Housing Act, 42 U.S.C. § 3606, provides that:

"After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, or national origin."

SSHC contends that the Realtors (GSSBR and NAR) denied or conditioned access to GSSBR's multiple listing service "on account of race" because their conduct was based upon the fact that SSHC's affirmative marketing plan pertaining to the Apache Street homes constituted a special outreach to white home buyers. The trial court rejected SSHC's argument, finding

that the Realtors' initial exclusion of the Apache Street homes from the MLS and the later requirement for indemnification as a condition for listing the homes were made in good faith based upon concerns that the Apache Street AMP constituted racial steering which was illegal and could result in potential liability for the multiple listing service or the MLS participants. *See South–Suburban Housing Center,* 713 F.Supp. at 1078–79. SSHC contends that these justifications are discriminatory by their very nature.

The question presented is whether the Realtors acted "on account of race," when they restricted access to the multiple listing service. Because SSHC has argued this case on a "disparate treatment," or "intentional discrimination," theory, our task is to determine whether the trial court's finding that the exclusion of the SSHC's properties was not made "on account of race" is free from clear error. *Cf. Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (holding that question of intentional discrimination under Title VII of the Civil Rights Act is a factual question subject to the "clearly erroneous" standard of review). In reviewing the question of whether the Realtors restricted access to GSSBR's multiple listing service "on account of race," we are without legal precedent to guide us, for no case law has been cited for us nor to our knowledge is there any. Thus, this is a case of first impression construing this section of the Fair Housing Act.

 SSHC essentially claims that the Realtors excluded them from the multiple listing service because they sought to market their properties to white persons. We have previously determined that the Fair Housing Act permits SSHC to implement an affirmative marketing plan directed toward interested white persons concerning properties they would not ordinarily consider. But, the mere fact that the Fair Housing Act may permit SSHC to

---

**14.** In the trial court, SSHC also challenged the Realtors' practices under 42 U.S.C. § 3604(a) and under state tort law theories. Because

SSHC did not raise these claims on appeal, we deem them to be abandoned.

affirmatively market its properties to potential white customers falls short of *requiring* that a realtor adopt this sales practice rather than a color-blind marketing scheme. As we held in *Village of Bellwood*, a broker who engages in color-blind marketing and

> "responds to the customer's desires, is not discriminating against the *customer*, or denying the *customer* a dwelling, or misrepresenting to the *customer* the unavailability of a dwelling. The statute ... does not impose liability for failing to promote integration, or for failing to coordinate individual integrative acts that have an aggregate resegregative effect. If the broker treats all his customers the same, regardless of race, he is not liable."

*Village of Bellwood*, 895 F.2d at 1531. We cannot understand how a color-blind marketing policy could possibly constitute discrimination "on account of race," nor can we fathom how the facts set forth in this record could be construed as establishing discrimination. Quite simply, the Fair Housing Act permits an AMP but does not require the Realtors or any other party to promulgate an affirmative marketing plan or to cooperate in another entity's implementation of such a plan. Thus, we are convinced that the Realtors did not violate 42 U.S.C. § 3606 when they excluded the listings of the Apache Street homes from the MLS and later conditioned participation in the MLS on indemnification against potential legal action.

### B. 42 U.S.C. § 3617

■ SSHC goes on to argue that the exclusion of its listings from GSSBR's multiple listing service, together with the Realtors' initiation of disciplinary proceedings against Motluck, interfered with SSHC's attempts to inform white persons of housing opportunities in violation of 42 U.S.C. § 3617. 42 U.S.C. § 3617 provides:

> "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the

exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action."

SSHC argues that section 3617 provides for a cause of action for interfering with the enjoyment of fair housing rights that is independent of violations of the enumerated sections, but as the trial court held, the "section does not under the circumstances of this case provide an independent ground for liability." *South–Suburban Housing Center*, 713 F.Supp. at 1080. In *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1288 n. 5 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), we declined to decide whether "a violation of section 3617 can be established without first establishing a violation of sections 3603, 3604, 3605, or 3606," but we held

> "that under the circumstances of this case, where the conduct that allegedly violated section 3617 is the same conduct that allegedly violated section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the [conduct] violated section 3604(a)."

*Id.* The same reasoning is apropos here, since the conduct SSHC alleges violated section 3617 is the same conduct that we refused to hold violative of section 3606 above.

Thus, we agree with the trial court's finding that SSHC has failed to demonstrate interference with the aiding or encouraging of other persons in the exercise of rights under the Fair Housing Act. As previously discussed, the Fair Housing Act guarantees to all regardless of race, color or creed the right to equal treatment, not to preferential treatment. The Realtors never interfered with much less opposed white persons learning about, seeing or purchasing the Apache Street homes on an equal basis with black persons. They simply disagreed with the special outreach efforts to white persons that SSHC included in its AMP. Because the Realtors' conduct

in limiting access to GSSBR's multiple listing service and in attempting to enforce their disciplinary rules against William Motluck do not limit SSHC's ability to "aid[ ] or encourage" white persons in their right to enjoy equal treatment in the housing market, the Realtors have complied with the mandates of 42 U.S.C. § 3617.

## IV. THE REALTORS' CHALLENGE TO THE MUNICIPALITIES' RESTRICTIONS ON SOLICITATION

The trial court concluded that the non-solicitation ordinances of the City of Country Club Hills and the Villages of Glenwood, Hazel Crest, Matteson and Park Forest violated the First Amendment to the United States Constitution insofar as they could be construed to "prohibit the mailing of mere promotional material from Realtors." *South–Suburban Housing Center,* 713 F.Supp. at 1095. The district court further determined that the ordinances were unconstitutionally vague because "despite the ordinances' requirement that a communication must be *intended to induce a sale or listing for sale,*" the municipality "believe[s] *every* 'business communication' from a real estate broker is a solicitation to list or sell...." *Id.* at 1096 (emphasis in original). The court went on to find that the language of the ordinance thus "provide[s] insufficient warning that 'indirect' solicitation is prohibited...." *Id.* Notwithstanding the constitutional defect, the trial court found that the ordinances did not violate the Fair Housing Act, since "there was no substantial showing that the solicitation ordinances have a disparate impact on blacks and ... there is no evidence of discriminatory intent with regard to the solicitation ordinance[s]...." *Id.* at 1095. The Realtors appeal from the Fair Housing Act finding while the municipalities appeal the constitutional rulings.

### A. Solicitation Restrictions under the Fair Housing Act

The Realtors assert that because the trial court found that "the ordinances are designed to keep residents from moving, to maintain the status quo and to reduce the ability of home seekers to find homes in the municipalities," *Id.* at 1093, they had the purpose and effect of making housing unavailable to blacks on account of their race. The Realtors contend that when the purpose of "keep[ing] residents from moving" is considered in light of the predominantly white population of the municipalities with anti-solicitation ordinances and the fact that many homeseekers are black, the anti-solicitation ordinances are discriminatory both in intent and in effect.

With respect to the Realtors' complaint that the ordinances were intended to discriminate against blacks, the trial court concluded that "the record is devoid of substantial evidence tending to show that the ordinances were intended to discriminate against blacks or any other racial group." *Id.* at 1094. We agree that the Realtors have pointed to nothing in the record that would even remotely demonstrate that the purpose of these facially neutral limitations on solicitation was to cause blacks to suffer racial discrimination.

The heart of the Realtors' Fair Housing Act challenge to these ordinances is that they had the racially discriminatory effect of preventing black home seekers from finding homes in the municipalities. However, the trial court concluded that:

"[T]here is no substantial evidence tending to show that the solicitation ordinances have had a racially discriminatory effect. The purpose of the ordinance is to bar from solicitation only those who request it. Therefore the only families barred from receiving solicitations are precisely those who are least likely to offer their homes for sale anyway—families (black and white, newcomers and oldcomers) who have affirmatively indicated that they are not interested in moving or selling or listing their homes and do not want to be bothered by real estate salesmen looking for business. The solicitation ordinances are facially neutral and nondiscriminatory as to race and the evidence failed to establish that they are otherwise with regard to effect or result."

*Id.* at 1094-95.[15]

In our opinion the trial court's analysis of this issue is persuasive. In particular, we believe it is significant that "the only families barred from receiving solicitations are precisely those who are least likely to offer their homes for sale anyway...." *Id.* at 1094. Consequently, any effect upon the sale of homes will be minimal because the only persons who cannot be contacted under the ordinances are those who have requested that their privacy not be disturbed and thus are not interested in receiving real estate solicitations.[16] In our opinion, the minimal effect the solicitation restrictions impose upon real estate activity causes no discernable discriminatory effect on the potential home buying public, even if it is predominantly black. Thus, the municipalities' limitations on Realtors' solicitation do not violate the Fair Housing Act.

### B. Solicitation Restrictions under the First Amendment

As we turn to the district court's invalidation of the municipalities' solicitation restrictions on First Amendment grounds, we begin by noting a discrepancy between the trial court's disposition and our decision in *Curtis v. Thompson*, 840 F.2d 1291 (7th Cir.1988). In *Curtis* we rejected a real estate broker's constitutionally based attempt to obtain a preliminary injunction against the Illinois state non-solicitation statute, which is comparable to the municipal ordinances at issue here.[17] The similarity between the municipal ordinances at issue in this case and the state statute

involved in *Curtis* might certainly lead us to expect that our holding in *Curtis* would control the outcome here.

An examination of *Curtis* reveals that our affirmance of the district court's rejection of the real estate broker's request for a preliminary injunction against the Illinois real estate solicitation statute was based upon the broker's failure to demonstrate a "better than negligible chance of success" on the question of the statute's constitutional invalidity. *Curtis*, 840 F.2d at 1296 n. 5. We began our First Amendment analysis with the recognition that "the speech in which Curtis wishes to engage is primarily aimed at proposing a commercial transaction, and should thus be classified as 'commercial speech.'" 840 F.2d at 1297 (citing *Bolger v. Young's Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). While we recognized that the ban on real estate solicitation was "content based," 840 F.2d at 1297, we noted the flexibility the Constitution permits a sovereign state in enacting content-based regulations on commercial speech:

"In the area of non-commercial speech, content-based restrictions (such as the one at hand) are sustained only in the most extraordinary circumstances: 'The First Amendment forbids the government from regulating speech in ways that favor some viewpoints or ideas at the expense of others.' [*Members of the City Council v.*] *Taxpayers for Vincent*, [466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984)]. This is because such 'core' First Amendment speech has always been considered essential to our survival as a democratic society: 'Free

---

**15.** The trial court then went on to specifically apply the test for determining whether a practice's effects result in discrimination set forth in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d at 1290, and found that the ordinances were not racially discriminatory.

**16.** We are unconvinced that the alleged problems the realtors may have with the deletion of names from mailing lists are a proper basis for holding that real estate activity is impeded. We believe interests in privacy are significant and important enough to require deletion of uninterested parties from mailing lists as a simple cost of doing business.

**17.** *See supra* note 5 for the text of the Illinois statute, Ill.Rev.Stat. ch. 38 ¶ 70-51(d). The state statute is slightly broader than the municipal ordinances in that the statute bans all real estate solicitation of individuals who had provided a non-solicitation request while the municipal ordinances only prohibit solicitation in the home. The municipal ordinances are also a bit more specific than the state statute in that they set up a procedure whereby the involved municipality compiles a non-solicitation list while the state statute merely prescribed methods for developing such lists without providing that the state would compile the list.

speech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964). By contrast, regulation of commercial speech based upon content is less problematic. Because of the greater potential for deception or invasions of privacy in the context of some advertising methods, content-based restrictions on commercial speech are more often upheld."

*Curtis*, 840 F.2d at 1297–98 (citations omitted).

We went on to apply the four-part test for determining the validity of a restriction on commercial speech contained in *Central Hudson Gas and Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), commencing with the following quotation from *Central Hudson*:

"In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within the provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

447 U.S. at 566, 100 S.Ct. at 2351. Applying the *Central Hudson* test, we initially determined that Curtis' speech was protected as it "concerns lawful activity and is not misleading." *Curtis*, 840 F.2d at 1298. In analyzing the interest involved, we noted the real estate broker's argument that the statute did not directly advance the state's interest in preventing inducements to sell real estate through appeals to fear of racial integration. But we refused to give these arguments controlling weight:

"Curtis raises an interesting question when she questions whether the regulation does advance the government's interest in a meaningful way to prevent blockbusting, but this argument ignores another overriding interest the state of Illinois argues is served by the statute: the interest in insuring the privacy of the homeowner. In our view, that interest is more than sufficient to justify the limited curtailment of Curtis' right to speak to citizens in their homes.

\* \* \* \* \* \*

"Unquestionably, Illinois' interest in ensuring the privacy of its residents while they are at home is strong and valid, even in the face of the First Amendment. The right to privacy sets America apart from totalitarian states in which the interests of the state prevail over individual rights; moreover, the unique importance of the right to privacy *in the home* has, from time immemorial, been amply demonstrated in our constitutional jurisprudence. As early as 1886, the United States Supreme Court recognized that the Fifth Amendment protects against all governmental invasions 'of the sanctity of a man's home and the privacies of life.' *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The First Amendment has been held to encompass the right to 'privacy and freedom of association in the home.' *Moreno v. United States Dep't of Agriculture*, 345 F.Supp. 310, 314 (D.D.C.1972), *aff'd*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)."

*Curtis*, 840 F.2d at 1299 (emphasis original). Furthermore, we said that "[w]hen the fundamental right to privacy clashes with the right of free expression, the interest in privacy does not play second fiddle when the speech is merely intended to propose a commercial transaction." *Id.* at 1300 (footnote omitted). We compared the Illinois statute to the federal statute involved in *Rowan v. United States Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), stating: "As in *Rowan*, the Illinois statute in this case circumscribes the mailer's right to communicate only by the addressee's taking affirmative action and giving notice to the mailer that he wishes no further mailings from his enterprise."

*Curtis*, 840 F.2d at 1301. Applying the *Central Hudson* requirement of advancing the governmental interest, we held that:

> "Contrary to Curtis' argument, the regulation in issue meets the *Central Hudson* test because it directly advances the goal of insuring privacy in the home. As was the case in *Rowan*, once a homeowner expresses his or her desire not to receive certain types of literature he or she determines to be objectionable, there simply is no further right to press those ideas on the unwilling recipient...."

*Id.* at 1302 (footnote omitted).

Based upon the above analysis, we formulated the following holding to explain why the Illinois statute restricting solicitation was valid under the First Amendment:

> "Our holding today is narrow: once a homeowner gives notice to a person that he or she does not desire to have the home listed for sale and that he or she does not desire to be contacted by real estate brokers who have previously been made aware of the decision, the right of a homeowner to decide what he or she will or will not hear, under the right to privacy, plainly outweighs the right of a real estate broker to continue to contact that person in his or her home. Once actual notice is received by a real estate agent, that agent is barred from contacting the homeowner for the purpose of persuading him or her to list the residence for sale. Our holding prevents

neither a buyer nor a seller of real estate from contacting any person who had not notified the particular broker that he wishes to be left undisturbed."

*Id.* at 1304 (footnote omitted).[18]

 The Realtors' challenge to the constitutionality of the municipal non-solicitation ordinances appears to recognize that our opinion in *Curtis* conflicts with their contentions but requests a re-evaluation and reversal of the *Curtis* decision. This we decline to do.

Before we address the specific contentions the Realtors raise concerning the constitutionality of these ordinances, we believe it important to briefly discuss a Supreme Court decision issued after our decision in *Curtis*, which directly spoke to the substantiality of the government interest in residential privacy. In *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the Supreme Court upheld against First Amendment challenge a local ordinance it interpreted to prohibit "focused picketing taking place solely in front of a particular residence...." 487 U.S. at 483, 108 S.Ct. at 2501. In considering the interest in residential privacy the court recognized the importance of this basic interest:

> " 'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.' *Carey v. Brown*, 447 U.S. [455,] 471, 100 S.Ct. [2286], at 2296 [65 L.Ed.2d 263 (1980) ].

---

18. The concurring judge agreed with the result reached by the court but believed *Rowan* to be distinguishable because "its holding was founded on the implied but obvious determination that the federal statute at issue there was content neutral and that it involved no '... discretionary evaluation of the material [by] a governmental official.' " *Curtis*, 840 F.2d at 1305. The dissent argued that "the merits of the plaintiff's constitutional argument must, at this very preliminary state of the litigation, be characterized as 'better than negligible.' " *Curtis*, 840 F.2d at 1308 (quoting *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir.1986)). He asserted that while "[t]he state certainly does have a strong interest in insuring the privacy of the home ... there is no record to support the proposition that this statute directly protects that interest." *Id.* at 1307. He felt that "there is nothing in the

record to support the conclusion that real estate solicitation is any more a threat to the privacy of the home than other forms of commercial intrusions." *Id.* The dissent also saw a problem with the final prong of the *Central Hudson* test, that the restriction be "not more extensive than is necessary to serve [the] interest," *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351, noting that the statute prevents "all real estate solicitation at any place (not just the home) at any time by any one." *Curtis*, 840 F.2d at 1307. He further questioned how directly *Rowan* supported our holding, since the statute in *Rowan* allowed recipients to "refuse any mail," and the Illinois statute only permitted restriction of "solicitations with respect to residential realty" and provided that the "recipient may apparently bar any message directed to him anywhere." *Id.* at 1308.

Our prior decisions have often remarked on the unique nature of the home, 'the last citadel of the tired, the weary, and the sick', *Gregory v. Chicago,* 394 U.S. 111, 125 [89 S.Ct. 946, 953, 22 L.Ed.2d 134] (1969) (Black, J., concurring), and have recognized that '[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.' *Carey, supra,* 447 U.S., at 471, 100 S.Ct., at 2295."

487 U.S. at 484, 108 S.Ct. at 2502. Then in language particularly relevant to the facts of our case, the Court emphasized the right of the resident to avoid speech intruding upon residential privacy and the right of governmental entities to enact legislation to facilitate the exercise of that right:

"One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. 'That we are often "captives" outside the sanctuary of the home and subject to objectionable speech ... does not mean we must be captives everywhere.' *Rowan v. Post Office Dept.,* 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970). Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom. *See, e.g., FCC v. Pacifica Foundation,* 438 U.S. 726, 748–749, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) (offensive radio broadcasts); *id.,* at 759–760, 98 S.Ct. at 3045–3046 (Powell, J., concurring in part and concurring in judgment) (same); *Rowan, supra* (offensive mailings); *Kovacs v. Cooper,* 336 U.S. 77, 86–87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949) (sound trucks).

"This principle is reflected even in prior decisions in which we have invalidated complete bans on expressive activity, including bans operating in residential areas. *See, e.g., Schneider v. State,* 308 U.S. 147, 162–163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) (handbilling); *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (door-to-door solicitation). In all such cases, we have been careful to acknowledge that unwilling listeners may be protected when within their own homes. In *Schneider,* for example, in striking down a complete ban on handbilling, we spoke of a right to distribute literature only 'to one willing to receive it.' Similarly, when we invalidated a ban on door-to-door solicitation in *Martin,* we did so on the basis that the 'homeowner could protect himself from such intrusion by an appropriate sign "that he is unwilling to be disturbed."' *Kovacs, supra,* 336 U.S. at 86 [69 S.Ct. at 453]. We have 'never intimated that the visitor could insert a foot in the door and insist on a hearing.' *Ibid.* There simply is no right to force speech into the home of an unwilling listener."

*Frisby,* 487 U.S. at 484–85, 108 S.Ct. at 2502 (citations omitted).

In light of the Supreme Court's powerful endorsement of the right of residential privacy in *Frisby,* the Realtors understandably do not challenge the proposition that residential privacy is a substantial governmental interest. Instead, they center upon the five municipal ordinances' alleged failure to conform to the final two prongs of the *Central Hudson* test. The Realtors assert that the ordinances do not "directly advance" the government's substantial interest in residential privacy and that the means the ordinances utilize are more extensive than necessary to serve their residential privacy purpose.

The Realtors' argument that the ordinances at issue fail to directly advance the interest in residential privacy focuses upon the ordinances' alleged "underinclusiveness." Specifically, the Realtors contend that the ordinances address only real estate solicitation when there is no demonstration that real estate solicitation is any greater threat to residential privacy than any other

form of solicitation. We rejected this argument in *Curtis:*

> "Curtis responds that the statute is underinclusive because it does not prohibit forms of mail other than real estate solicitations from entry in the home. Mere underinclusiveness does not, however, amount to constitutional infirmity. As explained previously, a restriction on commercial speech may well be valid where it 'directly advances the governmental interest asserted, and ... is not more *extensive* than is necessary to serve that interest.' *Central Hudson,* [447 U.S. at 566, 100 S.Ct. at 2351]. While the Illinois statute could have been *more* extensive, the state's decision to limit the scope of the statute does not translate into a constitutional problem...."

840 F.2d at 1302–03 (footnote omitted, emphasis in *Curtis*). Thus, as in *Curtis*, the "underinclusiveness" of the ordinance fails to prevent it from advancing the government's interest in protecting residential privacy.

We now turn to the Realtors' argument that the solicitation restrictions in the municipal ordinances are without a reasonable relationship to the residential privacy purpose of these ordinances because the constraints are more extensive than necessary. In *Curtis* we stated that "if the state's decision as to where to draw the line between ends and means is reasonable, a court may not use its own findings to upset a plausible state decision." *Curtis*, 840 F.2d at 1303 n. 11. As a general matter, the Realtors attack *Curtis* for this deference to legislative judgments in determining what constitutes the reasonable relationship between a law and the purpose of a law necessary to guarantee that the restrictions in the law are not more substantial than necessary to achieve its purpose. In response to the Realtors' contention, we point out that the Supreme Court's later decision in *Board of Trustees v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), confirms our position in *Curtis* concerning the necessity to permit legislative bodies to exercise appropriate discretion

concerning the tailoring of a law's means to achieve its ends:

> "In sum, while we have insisted that ' "the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing ... the harmless from the harmful," ' *Shapero* [*v. Kentucky Bar Ass'n*, 486 U.S. 466, 108 S.Ct. 1916, 1924, 100 L.Ed.2d 475 (1988) ], quoting *Zauderer* [*v. Office of Disciplinary Counsel*, 471 U.S. 626, 646, 105 S.Ct. 2265, 2279, 85 L.Ed.2d 652 (1988) ], we have not gone so far as to impose upon them the burden of demonstrating that the distinguishment is 100% complete, or that the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is a ' "fit" between the legislature's ends and the means chosen to accomplish those ends,' *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. [328] at 341, 106 S.Ct. [2968], at 2977 [92 L.Ed.2d 266 (1986) ]—*a fit that is not necessarily perfect, but reasonable;* that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' *In re R.M.J.* [455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) ]; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave to governmental decisionmakers to judge what manner of regulation may best be employed."

*Fox*, 109 S.Ct. at 3034–35 (emphasis added).

██ The Realtors present a two-faceted challenge to the appropriateness of the means used in the municipal solicitation restriction for achieving the ordinances' purposes. Initially, the Realtors make a broad attack on our reasoning in *Curtis* that the Supreme Court's recognition in *Rowan* of a governmental power to protect unwilling recipients from solicitation in their own homes supports the constitutionality of the Illinois statute. This attack, if successful, would presumably invalidate the Illinois statute and any municipal limi-

tation upon realtor solicitation of unwilling residents, irrespective of the restriction's scope. The second aspect of the Realtors' challenge is that, as the district court held, there is not a proper tailoring of the means of the ordinances to their ends because their "effect of banning all communication by mail from Realtors is far more extensive than necessary," to achieve the government's interest in "protecting the privacy of citizens who desire such protection" and "promoting the appearance of racial stability and avoiding fears of blockbusting and racial unrest." *South–Suburban Housing Center*, 713 F.Supp. at 1095. Success on this contention would invalidate a proscription of communications which do not directly solicit a real estate listing while permitting some restriction on direct solicitation of unwilling residents.

As stated above, the Realtors broadly contend that the Country Club Hills, Matteson, Glenwood, Hazel Crest and Park Forest ordinances do not utilize means which are appropriately suited to the goal of residential privacy because they do not involve mere attempts to facilitate the ability of objecting individuals to refuse to receive material under *Rowan*. The Realtors attempt to distinguish this case from *Rowan* by seizing upon language in the statute at issue in *Rowan* that provided that the householder could insulate himself from advertisements that offer for sale "matter which the addressee *in his sole discretion* believes to be erotically arousing or sexually provocative," 39 U.S.C. § 4009(a) (emphasis added), which means that

> "[i]n operative effect the power of the householder under the statute is unlimited; he may prohibit the mailing of a dry goods catalogue because he objects to the contents—or indeed the text of the language touting the merchandise. Congress provided the sweeping power not only to protect privacy but to avoid possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a governmental official."

*Rowan*, 397 U.S. at 737, 90 S.Ct. at 1491. The Realtors note that both the concurrence and the dissent in *Curtis* saw a distinction between the *Rowan* statute and the *Curtis* statute, which arguably would preclude absolute reliance upon *Rowan* as a rationale for upholding either the municipal anti-solicitation ordinances or the Illinois statute in *Curtis*.

With deference to the concurring and dissenting judges in *Curtis*, we are convinced that the ordinances at issue here and the statute in *Rowan* are materially indistinguishable for First Amendment purposes. In both legislative plans a householder is provided with the right to insulate himself from a particular category of communications. In *Rowan* the Supreme Court upheld the validity of a federal law permitting a householder to elect not to receive material that the householder believed to be "erotically arousing or sexually provocative." 39 U.S.C. § 4009(a). Indeed, the Supreme Court's discussion of the householder's right to control the receipt of unwanted mail has implications far beyond the statute at issue there:

> "In today's complex society we are inescapably captive audiences for many purposes, but a sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail. To make the householder the exclusive and final judge of what will cross his threshold undoubtedly has the effect of impeding the flow of ideas, information, and arguments that, ideally, he should receive and consider. Today's merchandising methods, the plethora of mass mailings subsidized by low postal rates, and the growth of the sale of large mailing lists as an industry in itself have changed the mailman from a carrier of primarily private communications, as he was in a more leisurely day, and have made him an adjunct of the mass mailer who sends unsolicited and often unwanted mail into every home. It places no strain on the doctrine of judicial notice to observe that whether measured by pieces or pounds, Everyman's mail today is made up overwhelmingly of material he did not seek from persons he does not know. And all too often it is matter he finds offensive.... Weighing

the highly important right to communicate, but without trying to determine where it fits into constitutional imperatives, against the very basic right to be free from sights, sounds, and tangible matter we do not want, it seems to us that a mailer's right to communicate must stop at the mailbox of an unreceptive addressee."

*Rowan*, 397 U.S. at 736–37, 90 S.Ct. at 1490. This case is similar to *Rowan* in that it involves local ordinances authorizing a resident's insulation from solicitation "intended to induce the sale, rental or listing for sale or rental of [a] dwelling" or "to offer or promote services in connection with the sale, rental or listing of [a] dwelling." Both in *Rowan* and the instant case it is the householder who is required to take the initiative in determining that he does not wish to receive the material. The *Rowan* Court's broad explanation of a householder's right to exclude unwanted mail fails to eliminate the similarity between the content-specific statute in *Rowan* and the content-specific ordinances at issue here. The district court's distinction between *Rowan* allowing "a resident to insulate himself from a particular mailer" and the authority granted in the ordinances to "exclude an entire class of mailers based upon occupation and content," *South–Suburban Housing Center*, 713 F.Supp. at 1102, is immaterial. Regardless of whether a single mailer or an entire class of mailers are involved, "a mailer's right to communicate must stop at the mailbox of an unreceptive addressee." *Rowan*, 397 U.S. at 736–37, 90 S.Ct. at 1490.

Although the Realtors would prefer the total invalidation of the municipal non-solicitation ordinances, they also argue, as the district court held, that the ordinances are constitutionally invalid because they effectuate the rights of unwilling residents to bar the receipt of mere indirect promotional material (realtor mailings not directly seeking a listing or sale of real estate) as well as direct attempts to solicit real estate.

We fail to see any reason why the distinction between direct realtor solicitation and indirect realtor promotional material is relevant to the relationship between the means utilized in the non-solicitation ordinances and their end of protecting residential privacy. Both materials which "directly" solicit a real estate listing and those that are merely "indirect" disturb a person who wants nothing to do with any sort of real estate solicitation. Thus, the municipal ordinances restricting solicitation are appropriately tailored to serve the important purpose of protecting residential privacy.

In sum, we remain convinced that *Curtis* was properly decided. The municipal ordinances at issue here, like the Illinois solicitation restrictions in *Curtis*, "directly advance" the interest in residential privacy and exhibit a reasonable relationship between means and ends that guarantees that the restrictions are not more extensive than necessary to achieve their residential privacy purpose. Thus, we reverse the district court's decision invalidating the ordinances under the First Amendment.

## C. Vagueness

■■ The trial court also invalidated the ordinances involved on the basis of vagueness. The court held that "[t]he text of the ordinances provide insufficient warning that 'indirect' solicitation is prohibited and thus they are unconstitutionally vague." *South–Suburban Housing Center*, 713 F.Supp. at 1096.[19]

In *Penny Saver* we dealt with the issue of the vagueness of a previous version of Hazel Crest's restriction on solicitations. The former ordinance's definition of solicitation did not exempt advertisements in newspapers of general circulation. The publisher of a local newspaper, the Penny Saver brought an action for injunctive relief, declaratory relief and damages, alleging that the ordinance was unconstitutionally vague. The district court granted de-

---

19. Examples of such "indirect" solicitation that could be considered prohibited, in the district court's view, were the following contacts between real estate brokers and homeowners: "an

exchange of business cards, a friendly chat while showing homes in a neighborhood, introducing new neighbors, or the announcement of the opening of a new office."

claratory relief, holding that the former ordinance was vague, and awarded damages to Penny Saver for lost advertising revenues.[20] In upholding the district court's vagueness conclusion, we describe the basic standard applicable to a vagueness challenge: "If this Ordinance's provisions concerning solicitation are so vague that 'men of common intelligence must necessarily guess at its meaning,' *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), then it is void for vagueness." *Penny Saver*, 905 F.2d at 155. Applying this standard, we held that:

> "[T]he Village's Ordinance was impermissibly vague because it failed to inform the advertisers of the specific conduct that would render them liable. It purported to regulate real estate solicitations yet failed to clearly define whether the Penny Saver's real estate advertisements were within the realm of the definition. This was compounded by the Village's enforcement practices. The Village had prosecuted Benkendorf for his advertising in the Penny Saver and stated its future intentions to actively enforce the Ordinance. Thus the advertisers were required to speculate as to the meaning of the Ordinance. *See Hynes* [*v. Mayor and Council of the Borough of Oradell*], 425 U.S. [610] at 620 [96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976)]. The language of the Ordinance did not provide the kind of precision which is required in statutes affecting first amendment interests and the extent of enforcement by the Village was unclear. *See id.* at 620 [96 S.Ct. at 1760]. Because of this uncertainty, advertisers were apparently 'chilled' in the exercise of their first amendment rights. Rather than risk prosecution under the Ordinance, they relinquished advertising in the Penny Saver entirely. Accordingly, we hold, as did the district court, that the Village's Ordinance was unconstitutionally vague as applied to potential advertisers in newspapers."

*Penny Saver*, 905 F.2d at 155 (footnote omitted).

In contrast to *Penny Saver*, we rejected a vagueness challenge to the Illinois solicitation restrictions noted above in *Curtis:*

> " 'A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct.' *Rowan*, 397 U.S. at 740, 90 S.Ct. at 1492. In this case appellant knows precisely what she must refrain from doing on receipt of statutory notice. The complainants' names must be removed from any mailing the broker may have, and the broker must refrain from future communications to the named addressees. Appellant runs no substantial risk of miscalculation."

*Curtis*, 840 F.2d at 1304 n. 12. The same analysis is applicable here. The clear and unambiguous terms of the ordinances (see ordinance provisions *supra* at 874–75), direct the Realtors precisely as to what they must do when they receive a copy of the list of householders who wish to exclude real estate solicitations from their mail: They must simply remove the names of the parties from their mailing lists and refrain from future communication to these addressees who do not desire solicitation. As in *Curtis*, we fail to see a "substantial risk of miscalculation" when a party provides the requisite statutory notice, and thus, the statute is not unconstitutionally vague.

### D. Equal Protection

The Realtors finally urge that the ordinances violate the Equal Protection Clause because they discriminate against the Realtors' speech through permitting homeowners to insulate themselves from real estate solicitations but not from other forms of speech. In *Curtis* we summarily disposed of an equal protection challenge to a similar statute, stating that: "Curtis' claim that the statute violates equal protection because it has no rational basis is

---

**20.** The request for injunctive relief had become moot, for the Village amended its ordinance to make it inapplicable to newspapers.

without merit. Our holding that the provision directly advances the state's interest in insuring the privacy of homeowners forecloses Curtis' equal protection challenge." *Curtis*, 840 F.2d at 1304 n. 12. *Curtis* was a clear application of the Supreme Court's reasoning in *Posadas de Puerto Rico Associates v. Tourism Co.*, 478 U.S. 328, 344 n. 9, 106 S.Ct. 2968, 2978 n. 9, where the Court held that "[i]f there is a sufficient 'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment, the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis." The discussion above established that there is a reasonable relationship between the legislature's means and ends.

The Realtors, however, argue that the analysis in *Posadas* is inapplicable herein, since *Posadas* concerned speech regarding an activity which could be banned entirely (casino gambling) while the speech involved here concerns an activity (real estate marketing) that the state could not entirely suppress. The Realtors' argument would have merit if the municipalities with anti-solicitation ordinances directly banned real estate solicitations from all households in their communities. But this argument must fall, for the ordinances at issue are narrowly drafted to merely make it possible for the individual homeowner to elect not to receive a particular category of speech. *Rowan* and *Curtis* establish that there is no problem under the First Amendment when federal and state entities establish a particular classification of mailed communications which a householder can choose not to receive. Like the Supreme Court in *Posadas*, we fail to see any distinction between First Amendment "sufficient fit" analysis and the Fourteenth Amendment "rational basis" inquiry. We are convinced that when a municipality provides homeowners with the option of excluding objectionable speech from their mail through an ordinance satisfying free speech concerns, the exclusionary provision also satisfies the "rational basis" concerns of the Equal Protection Clause.

## V. THE REALTORS' CHALLENGE TO THE MUNICIPALITIES' RESTRICTIONS ON "FOR SALE" SIGNS

The Realtors appeal from the trial court's determination that limitations on the size, placement and number of real estate "for sale" signs contained in the ordinances of Country Club Hills, Matteson, Park Forest and University Park were valid regulations of the place and manner of the involved speech. The Realtors further appeal from the district court's decision upholding the constitutionality of Country Club Hills' requirement that a permit be obtained for the display of a "for sale" sign. Finally, the Realtors appeal from the trial court's failure to hold that Glenwood's enforcement of a "for sale" sign ban followed by repeal of the ban on the eve of trial violated 42 U.S.C. § 3604(a) of the Fair Housing Act and merited an award of punitive damages under 42 U.S.C. § 3612(c).[21]

### A. Restrictions on Size, Placement and Number of "For Sale" Signs

▮ The municipalities have enacted a variety of regulations on the size, placement and number of real estate "for sale" signs on a given piece of real estate. As in the case of the municipalities' solicitation restrictions, we must determine whether these limitations on commercial speech satisfy the four-part test the Supreme Court promulgated in *Central Hudson*. It is clear that "for sale" signs contain expression concerning a lawful activity, sale of a home, and are not misleading. Thus, the questions to be resolved are "whether the regulation[s] directly advance[] the governmental interest asserted, and whether [they are] not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351.

The trial court found that the declared purpose for each of the municipalities' restrictions on "for sale" signs was the promotion of aesthetic appearance. *See*

21. The trial court rendered neither findings of fact nor conclusions of law on the Fair Housing

Act issues allegedly raised in Glenwood's conduct.

*South–Suburban Housing Center,* 713 F.Supp. at 1090. There is nothing in the record that leads us to conclude that these aesthetic interests, declared in either the preamble or the text of the ordinances involved, were not the genuine purposes of each ordinance. Thus, we must determine whether the ordinances "directly advanced" the asserted aesthetic interests. There can be little doubt that the limitations on the number of "for sale" signs per property found in the ordinances of Matteson, Park Forest, Country Club Hills and University Park advance concerns for proper physical appearance. A proliferation of signs in a residential community certainly detracts from the beauty of that community. Likewise, the restrictions on the size of signs found in the ordinances of Matteson, Park Forest and Country Club Hills facilitate aesthetic concerns. A large sign is a greater intrusion on a residential neighborhood's appearance than is a smaller sign. Finally, the sign placement provisions contained in each City's or Village's ordinance contribute to neighborhood beauty. Uniform placement of signs in the window of a home or a regulated distance from it insures that the signs will not prove as unsightly as haphazard placement. Thus, the municipal ordinances directly advance the legitimate governmental interest in the beauty of residential neighborhoods.

The more difficult question is whether there exists a reasonable relationship between the means the ordinances utilize and their purpose of promoting the quality of the residential neighborhood's appearance. As we noted in our discussion of the constitutionality of the municipalities' solicitation restrictions, the Supreme Court has given considerable leeway to legislative bodies in determining the appropriate means to further a legitimate governmental interest, even when enactments incidentally limit commercial speech. *See Board of Trustees v. Fox,* 109 S.Ct. at 3034–35.

The restrictions on the number of signs a seller may display on each property further the localities' interest in aesthetics while permitting a "for sale" sign to inform interested persons of the availability of a home. Because the record fails to demonstrate that these regulations prevent interested persons from learning a home is for sale, we conclude that they are "not more extensive than is necessary to serve [the government's legitimate] interest" in the appearance of its residential neighborhoods. As the trial court found, there is

> "little evidence that the sign regulations resulted in measurable lost income for realtors, that the regulations had a discriminatory impact on black home seekers, *or that they denied access to housing to anyone.* Therefore the court finds the sign regulations ... are modest and reasonable."

*South–Suburban Housing Center,* 713 F.Supp. at 1090–91 (emphasis added).

### B. Country Club Hills' Permit Requirement

■ The Realtors also challenge Country Club Hills' requirement that a permit carrying a fee of $60.00 be obtained for the display of a "for sale" sign in that City. The trial court rejected the Realtors' attack, holding that:

> "[T]he evidence submitted showed that Country Club Hills charged a fee and required an application for a permit for other commercial signs in residential areas. There was no evidence that the fees charged exceeded the administration costs."

*South–Suburban Housing Center,* 713 F.Supp. at 1103 (citations omitted).

The Supreme Court has established that a governmental body may enact a reasonable permit fee requirement to defray the cost of administering permissible regulation of a particular form of speech. *See Cox v. New Hampshire,* 312 U.S. 569, 576–77, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941). There can be no question that the imposition of Country Club Hills' permit fee directly advances the City's aesthetic purposes in defraying the expenses necessary to enforce its regulations of real estate signs. But, the issue remains of whether the trial court properly found that permit fees did not exceed the cost of the administration of the "for sale" sign regulations,

thus maintaining the necessary correlation between the ordinance's means and ends.

The Realtors assert that the district court's finding was improper because the City bears the burden of proof in justifying a restriction on commercial speech, and its failure to affirmatively demonstrate the specific costs it incurred in administering its ordinances regulating "for sale" signs meant that there was not the required relationship between the permit fee and the ordinances' purpose. We agree with the Realtors: "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require." *Fox*, 109 S.Ct. at 3035 (citation omitted). The Supreme Court has consistently invalidated fees that do not bear a rational relationship to the services involved in providing permits or licenses for communicative activities. *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 110 S.Ct. 688, 694, 107 L.Ed.2d 796 (1990); *Follett v. Town of McCormick*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). Since the City must justify restrictions on commercial speech, and the cost of a permit must be reasonably related to the City's cost in administrating the same, Country Club Hills was required to carry the burden of demonstrating that its permit fee of $60.00 for 6 months is not excessive in that it did not exceed the City's costs in enforcing its real estate sign regulations. Nonetheless, the City failed to present any specific evidence of dollar figures reflecting either the revenue it generated from its sign permit fees or its costs in administering its sign regulations. Because of the failure of Country Club Hills to demonstrate a reasonable relationship between its permit fees and administrative costs, we hold that the municipality's permit fee ordinance is unconstitutional.

## C. Glenwood's Enforcement and Cessation of Enforcement of its "For Sale" Sign Ban

The Realtors finally allege that the trial court erred in failing to find Glenwood in violation of 42 U.S.C. § 3604(a) [22] and subject to punitive damages under 42 U.S.C. § 3612(c) for its enforcement of an allegedly constitutionally invalid ban on real estate "for sale" signs until shortly prior to the commencement of trial. The trial court rendered neither specific factual findings nor conclusions of law on this issue in either its initial decision or in its supplementary decision on the parties' motions to alter or amend the judgment. The record suggests that this failure may not have been entirely the fault of the trial court because the Realtors' post-trial motion, while asking for various amendments of the court's findings of fact, conclusions of law and judgment made no mention of the court's failure to render specific factual findings or legal conclusions on this issue.

The questions of whether Glenwood violated the Fair Housing Act and whether its conduct merits an award of punitive damages are important and complex issues. Appellate review of the district court's judgment on these questions requires analysis of the trial court's reasoning that led it from a determination of the facts involved to an ultimate finding of discrimination or the absence thereof. To the extent the trial court in this case might be considered to have made a finding of non-discrimination, the absence of specific findings of fact or conclusions of law on this issue means that "we are unable to follow the district court's chain of reasoning...." *Andre v. Bendix Corp. (Andre I)*, 774 F.2d 786, 800 (7th Cir.1985). Since the "district court's findings are inadequate for meaningful appellate review and we are unable to ascertain its reasoning," we remand this issue. *Id.* at 801. However, because the evidentiary record has been fully developed, we do not believe a new trial is required and we will "remand[ ] to the same judge for further findings [or pro-

---

**22.** "[I]t shall be unlawful—To ... make unavailable or deny, a dwelling to any person because

of race, color, religion, sex, or national origin."

ceedings if necessary]," *id.*, with respect to the questions of whether Glenwood's enforcement and cessation of enforcement of its "for sale" sign ban violated the Fair Housing Act and called for an award of punitive damages. Circuit Rule 36 shall not apply.

## VI. CONCLUSION

In sum, we affirm the trial court's holding that the Realtors lack standing to pursue their constitutional claims as well as its dismissal of the Realtors' challenge to SSHC and Park Forest's implementation of the Apache Street affirmative marketing plan, since we hold that the AMP did not violate the Fair Housing Act. We also affirm the trial court's dismissal of SSHC's attacks on the Realtors' exclusion of the Apache Street listing from the MLS and commencement of disciplinary proceedings against William H. Motluck on the basis that this conduct also does not violate the Fair Housing Act. We affirm the trial court's dismissal of the Realtors' attempts to invalidate the regulations of size, placement and number of "for sale" signs per property in Country Club Hills, Matteson, Park Forest and University Park because the Realtors have failed to demonstrate that these provisions violate the First Amendment. But, we reverse the trial court and invalidate Country Club Hills' $60.00 "for sale" sign permit fee requirement because of the City's failure to demonstrate that this fee was related to the cost of administrating its real estate sign regulations. We also reverse the trial court's determination that the anti-solicitation ordinances of Country Club Hills, Matteson, Glenwood, Hazel Crest and Park Forest violated the First Amendment and were unconstitutionally vague. We hold that these ordinances are devoid of constitutional infirmity, and we affirm the district court's holding that the anti-solicitation ordinances are not violative of the Fair Housing Act. Finally, we remand to the district court judge for findings on the question of whether Glenwood's enforcement and pre-trial cessation of enforcement of its "for sale" sign ban violated the Fair

Housing Act and required an award of punitive damages.

AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.